

STATE OF NORTH CAROLINA

DURHAM COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO: 24CV_____-310

| | | |
|---|---|---|
| NILOUFAR FARID, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| DUKE UNIVERSITY HEALTH | ) | |
| SYSTEM, INC., d/b/a "DUKE | ) | |
| UNIVERSITY HOSPITAL"; and | ) | |
| HEATHER VESTAL, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES plaintiff NILOUFAR FARID ("Dr. Farid"), by and through counsel, pursuant to N.C. R. Civ. P. 8; and complaining against defendants DUKE UNIVERSITY HEALTH SYSTEM, INC., also doing business as "Duke University Hospital," and HEATHER VESTAL, M.D., (collectively "Defendants") alleges and says as follows:

### PARTIES AND JURISDICTION:

1. Dr. Farid is a citizen and resident of Calgary in Alberta, Canada.

2. Defendant Duke University Health System, Inc., also doing business as "Duke University Hospital," ("Duke"), is a corporation organized and existing under the laws of North Carolina with its primary place of business in Durham County, North Carolina.

3. On information and belief, defendant Heather Vestal, M.D. ("Dr. Vestal") is a citizen and resident of Durham County, North Carolina.

4.     At all times relevant herein, Duke has owned, operated, and maintained the *Psychiatry and Behavioral Sciences Residency Program* ("Program").

5.     At all times relevant herein, Dr. Vestal has been employed by Duke as the Program Director.

6.     At all times relevant herein, Duke has been an entity engaged in an industry affecting commerce, pursuant to 42 U.S.C. §§ 12111(5)(A), 2000e(b), and 29 U.S.C. § 2611(4)(A)(i), by providing hospital and health care services to patients and citizens throughout North Carolina and the United States.

7.     At all times relevant herein, Duke has had fifty (50) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and therefore, is an "employer" under 42 U.S.C. §§ 12111(5)(A), 2000e(b), and 29 U.S.C. § 2611(4)(A)(i).

8.     At all times relevant herein, Duke's managers and employees, as referenced herein, were acting within the scope of their employment for the actions against Dr. Farid and/or Duke has authorized or ratified the actions of its employees, as alleged herein. As such, Duke is vicariously liable for all acts and omissions of its managers and employees.

9.     This Court has original and concurrent jurisdiction over this action pursuant to N.C. Gen. Stat. § 7A-240 and § 7A-243.

10.     Venue in this Court is proper pursuant to N.C. Gen. Stat. § 1-82.

### ADMINISTRATIVE REMEDIES:

11.     On May 16, 2023, and within 180 days of being subjected to Duke's discriminatory and retaliatory employment practices, as alleged herein, Dr. Farid

2

filed a charge of discrimination (Charge No: 433-2023-00645) with the United States Equal Employment Opportunity Commission ("EEOC") alleging the illegal discrimination and retaliation, pursuant to 42 U.S.C. § 12117(a) and 42 U.S.C. § 2000e-5(e).

12. On May 24, 2024, the EEOC issued Dr. Farid a notice of rights to sue regarding the above-referenced charge of discrimination.

13. Within 90 days after having first received the referenced notice of right to sue from the EEOC, Dr. Farid filed this action for discrimination and retaliation *inter alia* with the Court, pursuant to 42 U.S.C. §§ 12117(a) and 2000e-5.

14. Pursuant to 42 U.S.C. §§ 12117(a) and 2000e-5, Dr. Farid has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

GENERAL ALLEGATIONS:

*First year of residency employment, sexual harassment/hostile workplace*

15. On July 1, 2019, Dr. Farid began employment with Duke as a resident physician assigned to its psychiatry department ("Department").

16. During her first year of residency employment, Dr. Farid became platonic friends with a colleague and fellow resident ("Dr. C").

17. At all times relevant herein, Dr. Vestal served as the immediate supervisor for both Drs. Farid and C. Dr. C is a male and Drs. Farid and Vestal are females.

18. Beginning around November 2019 and continuously thereafter, Dr. Vestal sexually harassed her subordinate resident employee, Dr. C, and created a

3

hostile work environment for him because of his sex. Examples of Dr. Vestal's sexual harassment of Dr. C include, but are not limited to, the following:

   a. Continuously asking Dr. C about his workout routine;

   b. Continuously commenting to him about his physique;

   c. Increasing the frequency of her physically touching him;

   d. Making inappropriate comments to him, including a risqué comment about a photograph depicting Dr. C wearing a bathing suit;

   e. In a flirtatious manner, informing Dr. C that when she was an assistant program director, she began dating a resident who later became her husband; and

   f. Inviting Dr. C to text her "anytime" that he wished and providing him with her personal cell phone number.

19. During a research meeting in January of 2020, Dr. Vestal asked Dr. C if he was friends with fellow resident, Dr. Farid. Dr. Vestal then made disparaging comments about Dr. Farid and her having allegedly dressed "inappropriately" in a picture displayed on Instagram.

20. In February of 2020, Dr. Vestal unilaterally reached out to senior residents to inquire whether they suspected a romantic relationship between Dr. C and Dr. Farid. On information and belief, Dr. Vestal's purpose in making these inquiries was to initiate and implant false rumors among the residents in an effort to

4

harass Dr. Farid. Dr. Vestal also asked Dr. C if he was having a romantic relationship with Farid.

21.     During this time frame, Dr. Vestal informed Dr. C that she had assessed his residency performance and had developed concerns about his performance. Dr. Vestal then asked Dr. C if she could mentor him one-on-one while she touched his inner thigh. Dr. C declined Dr. Vestal's mentorship offer and because of discomfort, requested that Dr. Vestal's predecessor program manager conduct his resident reviews and evaluations along with her.

22.     Around March 2020, as Dr. Vestal continued with the sexual harassment of Dr. C, on information and belief, Dr. C filed an internal complaint with Duke's Office of Institutional Equity ("OIE") alleging sexual harassment by Dr. Vestal and a hostile work environment resulting from the same. Dr. Farid agreed to be a witness in this matter and Dr. C listed her in the complaint as a witness to the allegations contained therein.

23.     During the summer of 2020, Dr. Vestal continued to call Dr. C incessantly, including sometimes late in the evening outside of business hours with increasing frequency.

24.     Because of his continued discomfort with Dr. Vestal's actions, Dr. C eventually asked her if he could have a chaperone present to mediate their conversations and contacts.

25.     Shortly after Dr. C's request for a chaperone, Dr. Vestal issued Dr. C a routine corrective action ("RCA"), which is a precursor to dismissal. Dr. Vestal issued

5

the RCA, notwithstanding that Dr. C had received excellent evaluations during his rotations and, on information and belief, had finished his residency year ranked ahead of all his peers in every category and even received the top resident award over all of Duke's residents.

26.    In the RCA, on information and belief, Dr. Vestal misrepresented the underlying facts in an effort to "justify" the initial disciplinary action.

27.    In accordance with RCA procedure, Dr. Vestal assigned Duke's Barbara Mattox, M.D. ("Dr. Mattox") as Dr. C's mentor during the process. During this meeting, Dr. C formally requested that a chaperone be present for all of his encounters with Dr. Vestal and Dr. Mattox agreed to this request.

28.    In August of 2020, Dr. Farid and another female co-resident physician, inquired and complained about the false rumors and gossip that were generated by Dr. Vestal's inappropriate "inquiries" about Dr. C's relationship with Dr. Farid. Shortly thereafter, Dr. Vestal called the other female resident who had complained into her office on a Saturday and threatened that any continued inquiry into the matter would negatively impact any future letters of recommendation by her for a fellowship.

### *Dr. Farid's efforts to have Duke address hostile work environment*

29.    Following Dr. Vestal's intimidation of the co-resident, Dr. Farid filed a formal complaint with Duke's Graduate Medical Education ("GME") division regarding Dr. Vestal's Saturday meeting and the underlying retaliatory threats against her.

6

30.     The false rumors and gossip within the workplace that Dr. Vestal initiated about Drs. C and Farid having an inappropriate sexual relationship continued unabated.

31.     In an effort to remedy the hostile work environment, Dr. Farid requested the opportunity to address directly to her resident peers the prevalent false rumors and gossip along with the resulting adverse effects on her. However, Dr. Vestal denied the request and refused to take any alternative remedial action.

32.     In August 2020, Dr. Farid met with Duke's director of graduate medical training, Cathy Kuhn, M.D. ("Dr. Kuhn"), to complain about the ongoing prevalent false rumors and gossip, including sexual innuendos and Dr. Vestal's refusal to remediate the same. In response to her complaint, Dr. Kuhn refused to investigate or take any action to remediate the hostile work environment. Instead, Dr. Kuhn merely advised Dr. Farid to "ignore it." Dr. Farid responded that simply ignoring the hostile work environment was not an appropriate remedy because the false rumors and gossip made her very uncomfortable and undermined her work.

33.     Dr. Kuhn refused to take any action in response to Dr. Farid's harassment complaint and, unfortunately, the false rumors and sexual innuendoes about Dr. Farid continued. Soon thereafter, Dr. Farid went on a one-month leave of absence for depression resulting from Dr. Vestal's unabated harassment and the hostile work environment.

34.     In February of 2021, after returning to work following the one-month leave of absence for depression, Dr. Farid filed a complaint with the OIE about the

7

hostile work environment arising from the persistent false rumors and gossip about her relationship with Dr. C. Dr. Farid also complained about the bullying and retaliation from peers that she had faced because of her prior complaints about sex discrimination.

*Retaliation against Dr. Farid and Dr. C*

35.     On information and belief, Dr. Vestal, without a reasonable factual basis, filed a complaint with the OIE about "concerns" of a romantic relationship between Dr. C and his female RCA mentor, Dr. Mattox. Dr. C, however, had only interacted with Dr. Mattox on a professional level and had not even seen her within the previous six months. Becoming aware about the process from Dr. Vestal's filing, Dr. C filed a formal complaint on information and belief with the OIE about Dr. Vestal's sexual harassment and retaliation towards him.

36.     In March of 2021, Dr. Farid complained again to Dr. Vestal about the hostile work environment and requested a mediation process with her co-residents. However, Dr. Vestal denied this request and took no remedial action in response to the same.

37.     In March of 2021, Dr. Vestal made the unilateral decision on information and belief not to renew Dr. C's employment contract for the following year based on faux concerns about "patient safety." On information and belief, Dr. Vestal's decision not to renew Dr. C's employment contract was based exclusively on retaliation for his having engaged in protected activity under Title VII by complaining about Duke's hostile work environment.

8

38. In May of 2021, Dr. Farid complained to Duke's Internal Safety Reporting system about the continued harassment, retaliation, and hostile work environment caused by Dr. Vestal. Within a couple weeks thereafter, Dr. Vestal met with Dr. Farid to inform her that she would not be permitted to "fast-track" into Fellowship Training because of an alleged error that she had made during a call shift. Even though Dr. Farid provided information showing no intentional violation, Dr. Vestal ignored her response and refused to investigate the real cause of the error relating to the fault of another physician.

39. Around May of 2021, on information and belief, Dr. Mattox filed a complaint with Duke's OIE detailing concerns about the harassment, hostile work environment, and retaliation attributable to Dr. Vestal. On information and belief, during this time period, Dr. C filed a complaint with the Accreditation Council for Graduate Medical Education ("ACGME") regarding Dr. Vestal's retaliatory non-renewal of his employment contract. Dr. Farid agreed to be a witness in this matter and Dr. C listed her in the complaint as a witness to the allegations contained therein.

40. During a meeting on July 7, 2021, Dr. Vestal placed Dr. Farid on an RCA based on false accusations in retaliation for having engaged in protected activity under Title VII. Dr. Farid emailed Dr. Vestal where she informed her that she took the (pretextual) allegations seriously and accepted responsibility for any legitimate errors on her part. Dr. Farid indicated receptiveness for feedback and specifically requested clarification and guidance as to what is an "expected display of accountability," as referenced in the RCA.

9

41.     Dr. Vestal ignored Dr. Farid's request (along with subsequent follow-up requests) and refused to provide any clarification or guidance to Dr. Farid regarding the same.

42.     Dr. Farid filed an appeal of Dr. Vestal's issuance of the RCA by highlighting the factual inaccuracies contained therein and requesting that the inaccuracies be investigated further. However, Duke took no action to investigate Dr. Farid's appeal and complaint therein.

43.     Around this time, Dr. Farid provided names and details to Dr. Kuhn to assist with her "investigation" of the complaint. However, rather than investigating the complaint and providing prompt and effective remedial action, Dr. Kuhn merely advised Dr. Farid that she should be focusing on her corrective action (*i.e.* RCA) instead of filing complaints about the harassment, retaliation, and hostile work environment.

*Ignored requests for accommodation under ADAAA*

44.     On October 11, 2021, Dr. Farid informed Dr. Vestal that she was seeking accommodations for her disabilities of depression and attention-deficit/hyperactivity disorder (collectively "disabilities") under the *Americans with Disabilities Act* ("ADAAA") and requested a meeting to discuss the same.

45.     Dr. Vestal ignored Dr. Farid's request to discuss potential reasonable accommodations under the ADAAA and refused to engage in the interactive process.

46.     During their next meeting in October of 2021, Dr. Farid further explained to Dr. Vestal about her disabilities and how these disabilities impacted her

10

ability to fulfill the requirements contained in the RCA (largely because the volume of daily emails was overwhelming). Dr. Vestal again refused to engage in the interactive process with Dr. Farid concerning her request for reasonable accommodations under the ADAAA.

47.     On October 20, 2021, Dr. Farid submitted a written request for reasonable accommodations under the ADAAA to Duke's Disability Management System. Specifically, Dr Farid requested that work instructions be provided to her in writing and that she be provided with additional time to complete administrative tasks.

48.     In October of 2021, Dr. Farid complained to Dr. Vestal and the GME about Duke's failure to remediate the hostile work environment and that she felt unsafe during the meeting of October 11, 2021. Dr. Farid requested that no meetings occur in the future unless her mentor is also in attendance. Both GME and Dr. Vestal ignored Dr. Farid's complaint.

49.     During an RCA meeting on November 9, 2021, Dr. Farid again requested reasonable accommodations for her disabilities under the ADAAA, but Dr. Vestal again refused to discuss the same with her and refused to engage in the interactive process. Notwithstanding the hostile work environment and retaliation, Dr. Farid successfully completed the terms of the RCA on January 10, 2022.

50.     On February 10, 2022, Dr. Farid met with a supervisor, Dr. Susan Hazlett, to seek again to engage in the interactive process and discuss potential reasonable accommodations for her disabilities under the ADAAA. Specifically, Dr.

11

Farid requested that she be provided with a scheduled break between patient therapy sessions. However, Dr. Hazlett denied Dr. Farid's request for reasonable accommodations and refused to engage in good faith in the interactive process.

51. In March of 2022, as a reasonable accommodation, Dr. Farid requested a schedule change to include more scholarly time due to her mental health. However, Dr. Vestal denied such request for reasonable accommodations and refused to engage in good faith in the interactive process.

52. In April of 2022, Dr. Farid emailed Dr. Vestal and the assistant program director, Martha Wald, M.D., to report that a supervisor, Dhipthi Brundage, M.D. had been making inappropriate and disparaging remarks about her private health information and disability. However, Drs. Vestal and Wald refused to investigate or otherwise take any effective remedial action to address Dr. Farid's complaint and health privacy concerns under the ADAAA.

53. During a review meeting on September 16, 2022, Dr. Farid again expressed concerns about the volume of patients in her outpatient clinic and her health and well-being being secondary to the emotional damages that she had suffered because of the hostile work environment.

54. During this meeting, Dr. Farid specifically discussed the need for FMLA leave and requested eligibility information for the same. However, Dr. Vestal refused to provide Dr. Farid with any information regarding eligibility or qualifications for FMLA leave.

12

55.     On September 19, 2022, Dr. Farid sent an additional follow-up email to Dr. Vestal regarding her ongoing concerns about the current patient load and patient acuity during her absences from three clinics due to Fellowship interviews. Dr. Farid informed her that the accommodation of one-hour of administrative time was inadequate. However, Dr. Vestal again refused to enter in good faith into the interactive process or otherwise address Dr. Farid's request for reasonable accommodations.

### *Retaliation against Dr. Farid*

56.     On October 5, 2022, Dr. Farid complained to a peer, Sarah Wilda, M.D. ("Wilda"), about comments and behaviors that had contributed to a hostile work environment. To follow-up, Dr. Farid requested a meeting with Dr. Vestal so that she could discuss the hostile work environment with Dr. Wilda in attendance. However, Dr. Vestal refused to meet with Drs. Farid and Wilda for this purpose.

57.     During an email exchange on or about October 12, 2022, Dr. Farid informed Dr. Vestal that she planned to file a discrimination complaint with an external agency (EEOC) regarding the hostile work environment under Title VII and/or the ADAAA.

58.     The following day on October 13, 2022, Dr. Vestal informed Dr. Farid that effective immediately she was placed on automatic suspension under the pretext of "unexcused absences." Although she acknowledged that Dr. Farid had informed her immediate supervisors about the alleged work absences, Dr. Vestal alleged that

13

Dr. Farid never informed *her* about the work absences and falsely asserted that it was "policy" for Dr. Farid to have informed her about the otherwise excused absences.

59.     Dr. Vestal also falsely asserted that Dr. Farid had "refused to meet" with her. Without any reasonable basis, Dr. Vestal directed Dr. Farid to attend an appointment with occupational health and threatened further suspension if she did not comply.

60.     Duke violated its own policy by imposing an automatic suspension of Dr. Farid without having provided her with any notice about her alleged absences.

61.     In retaliation against Dr. Farid for asserting her rights under title VII and the ADAAA and engaging in protected activity under the same, Dr. Vestal provided Duke's Clinical Competence Committee ("CCC") with false or exaggerated statements regarding Dr. Farid and her work performance.

62.     On December 7, 2022, Dr. Farid met with Dr. Vestal and Tyson Pankey, Dr. Farid's RCA mentor, and was informed of Duke's decision to terminate her employment as a resident physician. Her termination became effective on December 12, 2022.

63.     In further retaliation, Dr. Vestal submitted a statement to the Educational Commission for Foreign Medical Graduates ("ECFMG") in December of 2022 that included a false narrative about the events leading to termination. On information and belief, Dr. Vestal filed the false complaint with the ECFMG in a further retaliatory effort to foreclose her ability to obtain any training sufficiently to

14

become board-certified, which is a requirement for employment as a foreign national (*i.e.* Dr. Farid is a citizen of Canada).

64.    Following her termination, Dr. Farid requested access to her personnel file to prepare for the hearing on her administrative appeal of the termination. However, Duke denied Dr. Farid's request to access her personnel file or otherwise obtain a copy of it even though she had the right to review it under Duke's policy.

65.    During the appeal hearing on or about January 10, 2023, Dr. Vestal and Julie Penzner, M.D., assistant Program director, continued to retaliate against Dr. Farid by providing the panel with false information about Dr. Farid. Moreover, on information and belief, the panel refused to consider any substantive issue regarding the termination, but only considered the procedural issues.

*Harms and losses resulting from Defendants' illicit termination*

66.    To obtain the requisite certification for employment as a psychiatrist in the United States, a foreign national such as Dr. Farid must first become eligible to take the initial certification exam by the American Board of Psychiatry and Neurology. To sit for the initial certification exam, residents must have completed an accredited residency program, such as the one operated by Duke.

67.    As a direct and proximate result of Duke's termination of Dr. Farid prior to her completion of the program, Duke has purposefully kept Dr. Farid from being eligible to be board-certified as a psychiatrist.

68.    In an effort to mitigate damages, Dr. Farid has attempted to enter other accredited residency programs in psychiatry, but to no avail. On information and belief, other accredited programs have rejected Dr. Farid's applications because

15

she was terminated from Duke's program and/or because of unwarranted negative comments that the referenced programs received from Defendants about Dr. Farid.

69.     As a direct and proximate result of Duke's illicit termination of Dr. Farid and her removal from the residency program, Dr. Farid will be unable to be employed in another residency program. Consequently, Defendants' actions have destroyed any meaningful opportunity for Dr. Farid to obtain employment as a psychiatrist.

70.     On information and belief, Dr. Farid will continue to suffer from harms and losses resulting from Defendants' illicit termination and subsequent false disparagement for the balance of her career.

<u>FIRST CLAIM FOR RELIEF</u>:
(Title VII--Hostile Work Environment--Duke)

71.     The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

72.     From January of 2020 until her termination on December 12, 2022, Dr. Farid was subject to unwelcome conduct of a sexual nature by Dr. Vestal. Such conduct included but was not limited to the following:

      a. Disparaging comments to Dr. C about Dr. Farid dressing inappropriately in a picture displayed on Instagram;

      b. Inquiries to senior residents about whether they suspected a romantic relationship between Dr. C and Dr. Farid; and

      c. Spreading false rumors among senior residents insinuating that Dr. C and Dr. Farid were engaged in a sexual relationship.

16

73. Dr. Vestal's conduct as described herein undermined Dr. Farid's working relationship with her peers and adversely affected Dr. Farid's mental health, resulting in Dr. Farid having to take a one-month leave of absence for depression. As Dr. Vestal's conduct continued unabated, Dr. Farid continued to suffer from depression throughout her employment with Duke.

74. Dr. Vestal's conduct as described herein was sufficiently severe and pervasive so as to alter the conditions of Dr. Farid's employment and create an abusive working environment.

75. Duke knew about Dr. Vestal's conduct as Dr. Farid complained directly to Duke's director of graduate medical training, to Duke's Internal Safety Reporting System, and to Duke's Office of Institutional Equity about Dr. Vestal's conduct. Despite these complaints, Duke took no action.

76. As a direct result of the hostile work environment as alleged herein, Dr. Farid has suffered harms, losses, and damages in excess of $25,000.00.

SECOND CLAIM FOR RELIEF:
(Title VII--Retaliation--Duke)

77. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

78. In response to the hostile work environment as alleged herein, Dr. Farid participated in the following protected activities:

      a. complained to Duke's director of graduate medical training;

      b. complained to Duke's Internal Safety Reporting System;

      c. filed a complaint with Duke's OIE;

17

        d.  informed Dr. Vestal that she planned to file a complaint with the Equal Employment Opportunity Commission; and

        e.  agreed to be listed as a witness in Dr. C's sexual harassment/hostile work environment complaint filed with ACGME and Duke's OIE.

79.    As a result of Dr. Farid's participation in protected activities under Title VII, she suffered adverse employment actions including, but not limited to, the following:

        a.  she was issued an RCA, a precursor to dismissal;

        b.  she was placed on automatic suspension;

        c.  false statements regarding her work performance were provided to the CCC and the ECFMG;

        d.  she was denied her requests for reasonable accommodations for her disabilities; and

        e.  termination of her employment.

80.    On information and belief, if not for Dr. Farid's participation in protected activities under Title VII, the adverse employment actions described herein would not have occurred.

81.    On information and belief, Duke knew of the retaliatory actions alleged herein.

82.    As a direct result of the retaliatory actions alleged herein, Dr. Farid has suffered harms, losses, and damages in excess of $25,000.00.

18

## THIRD CLAIM FOR RELIEF
### (ADAAA--refusal to provide reasonable accommodations--Duke)

83. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

84. At all times relevant herein, Dr. Farid has been "disabled" within the meaning of 42 U.S.C. § 12101(2) in that she has lived with major depression, ADHD, and other conditions (collectively "disabilities") that have substantially limited one or more of her major life activities, such as thinking, reading, concentrating, and working.

85. At all times relevant herein, Dr. Farid's disabilities, as alleged herein, were well known by Dr. Farid's supervisors, including without limitation Dr. Vestal.

86. At all times relevant herein, Dr. Farid has been a qualified individual with a disability within the meaning of 42 U.S.C. § 12112(a) because notwithstanding her physical or mental impairment of major depression and related conditions, Dr. Farid was able to perform the essential functions of her job as a resident and was fulfilling the legitimate expectations of Duke with or without reasonable accommodations.

87. Alternatively, and at all times relevant herein, Dr. Farid has had a record of the physical or mental impairment of major depression, ADHD, or was "regarded as" by Duke's managers as having had such impairments just prior to her dismissal.

88. On numerous occasions Dr. Farid requested reasonable accommodations from Duke and Dr. Vestal concerning her disabilities, as alleged herein.

19

89.     Dr. Farid specifically requested of Duke at different times that the following accommodations be made for her:

        a.  work instructions be provided;

        b.  allowance of additional time to complete administrative tasks;

        c.  scheduled break in between patient therapy sessions; and

        d.  schedule adjustment to include more time for scholarly work.

90.     The accommodations that were requested by Dr. Farid were reasonable and available for Duke to provide and would not have imposed any undue hardship on the operation of Duke's mission, operations, or provisions for its patient services.

91.     Duke's repeated failure to provide these reasonable accommodations exacerbated her depression and made it more difficult for Dr. Farid to perform her job.

92.     Instead of providing Dr. Farid with the requested accommodations or otherwise continuing the interactive process, Duke terminated Farid's employment for no legitimate reason or cause.

93.     As a direct and proximate result of Duke's failure to provide reasonable accommodations to Dr. Farid as alleged herein, Dr. Farid has suffered harms, losses, and damages in excess of $25,000.00.

## FOURTH CLAIM FOR RELIEF:
### (ADAAA--Retaliation--Duke)

94.     The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

Case 1:24-cv-00778-LCB-LPA     Document 1-2     Filed 09/23/24     Page 20 of 27

95. Beginning on October 11, 2021, Dr. Farid engaged in protected activity by requesting in good faith reasonable accommodations from Duke, pursuant to the ADAAA. These requests were ongoing until her employment with Duke was terminated on December 12, 2022.

96. On information and belief, Duke terminated Dr. Farid's employment because she had in fact sought reasonable accommodations in good faith for her disabilities.

97. On information and belief, if not for Dr. Farid seeking reasonable accommodations from Duke for her disabilities pursuant to ADAAA, the adverse employment actions described herein would not have occurred.

98. As a direct and proximate result of Duke's retaliatory actions against Dr. Farid as alleged herein, Dr. Farid has suffered harms, losses, and damages in excess of $25,000.00.

### FIFTH CLAIM FOR RELIEF
(ADAAA--Disparate treatment--Duke)

99. On information and belief, Duke wrongfully and intentionally discriminated against Dr. Farid because of her disabilities in violation of the ADAAA, as codified in 42 U.S.C. §§ 12101, *et seq.*

100. As a direct and proximate result of Duke's disparate treatment of Dr. Farid, as alleged herein, she has suffered actual harms, losses, and damages in excess of $25,000.00.

101. Alternatively, Duke's adverse treatment and employment actions against Dr. Farid were caused or influenced by Duke's managers who were motivated

21

by a discriminatory animus that was intended to cause and, if fact, did cause Duke's adverse treatment and materially adverse actions towards Dr. Farid.

102. On information and belief, Duke has engaged in the discriminatory practices, as alleged herein, with malice or with reckless indifference to the federally protected rights of Dr. Farid.

103. On information and belief, if not for Dr. Farid's disabilities, the adverse employment actions described herein would not have occurred.

104. As a direct and proximate result of Duke's discrimination against Dr. Farid as alleged herein, Dr. Farid has suffered harms, losses, and damages in excess of $25,000.00.

## SIXTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress--Dr. Vestal)

105. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

106. Dr. Vestal abused her position of power as Program Director by sexually harassing resident physician, Dr. C, and then initiating false rumors that Dr. C and Dr. Farid were involved in a sexual relationship.

107. When Dr. C and Dr. Farid asserted their rights under Title VII and complained about Dr. Vestal's conduct, Dr. Vestal retaliated by making false allegations regarding their respective job performances, denying Dr. Farid's reasonable accommodations for her disabilities under ADAAA, having Dr. Farid and Dr. C ousted from the program, and crippling Dr. Farid's ability to obtain employment in her chosen profession.

22

108. Dr. Vestal's conduct as alleged herein constituted extreme and outrageous conduct which was intended and, in fact, caused Dr. Farid severe emotional distress.

109. As a direct and proximate result of Dr. Vestal's actions against Dr. Farid as alleged herein, Dr. Farid has suffered harms, losses, and damages in excess of $25,000.

SEVENTH CLAIM FOR RELIEF
(FMLA Interference--Duke)

110. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

111. On September 19, 2022, Dr. Farid met with Dr. Vestal and Assistant Program Director Dr. Tyson Pankey and inquired about FMLA eligibility for her worsening systems of depression. Both Dr. Vestal and Dr. Pankey were aware that she would require FMLA leave based on their knowledge of her condition and circumstances at the time.

112. At that time, Dr. Farid qualified as an "eligible employee" under the FLSA because she had been employed by Duke for at least 12 months with 1,250 hours of service during the previous 12-month period.

113. Despite their knowledge of Dr. Farid's condition and her FLSA eligibility, Drs. Vestal and Pankey purposefully withheld information to prevent Dr. Farid from exercising her FMLA rights.

114. Due to the conduct of Dr. Farid and Dr. Pankey, acting in the course and scope of their employment for Duke, Dr. Farid was discouraged from exercising her

FMLA rights and in failing to obtain necessary FMLA leave, sustained injuries and damages.

115.    As a direct and proximate result of Duke's actions against Dr. Farid as alleged herein, Dr. Farid has suffered harms, losses, and damages in excess of $25,000.

## EIGHTH CLAIM FOR RELIEF
(Breach of Contract--Duke)

116.    The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

117.    Dr. Farid entered into an employment with Duke whereby in exchange for financial compensation, health and other benefits, medical training, and other obligations assumed by Duke, Dr. Farid agreed to perform many hours of medical services to Duke's patients and other obligations.

118.    The employment agreement provided Dr. Farid with due process rights that were essential elements of the contractual employment relationship between Dr. Farid and Duke.

119.    Duke violated the terms contained in the employment agreement in at least the following ways:

        a. imposing an automatic suspension of Dr. Farid without having provided her with any notice about her alleged absences; and

        b. denying Dr. Farid's request to access her personnel file or otherwise obtain a copy of it even though she had the right to review it under Duke policy.

24

120. Dr. Farid's employment agreement with Duke also limited the circumstances under which she could be terminated to conduct inconsistent with Duke's standards of patient care or objectives of the Program's educational expectations, or to conduct which reflected adversely on the Program or disrupted the Program's operations.

121. At no time had Dr. Farid ever violated the terms of her employment contract or otherwise acted in any way that could justify her termination for any of the reasons permitted by the employment agreement.

122. On information and belief, Duke terminated Dr. Farid for reasons not permitted under the contract, including reasons that were not related to her conduct or work performance.

123. Moreover, Duke breached its implied covenant of good faith and fair dealing by interfering or otherwise injuring Dr. Farid's right to receive the benefits of the employment agreement, as alleged herein.

124. As a direct and proximate result of Duke's breach of the employment agreement, as alleged herein, Dr. Farid has been damaged in an amount in excess of $25,000.00.

125. There have occurred, or have been performed, all conditions precedent to Dr. Farid's recovery of judgment against Duke under the claims alleged herein.

<u>PRAYER FOR RELIEF:</u>

WHEREFORE, Dr. Farid prays unto the Court as follows:

1. That the Court issue a permanent injunction granting the following

equitable relief:

A. issue declaration that Duke discriminated and retaliated against in violation of Title VII and/or the ADAAA;

B. reinstate Dr. Farid to her former position with Duke;

C. reimburse Dr. Farid for all back pay and benefits;

D. require that Duke remove from any personnel file or other records pertaining to Dr. Farid that state or otherwise reference that at any time she had been terminated or otherwise subjected to any disciplinary action pertaining to her separation or engaged in any wrongdoing of any kind while employed by Duke;

E. mandate that Duke refrain from reporting or sharing data with third parties, such as licensing boards or credentialing services, that assert or otherwise reference that Dr. Farid has at any time been terminated or subjected to any disciplinary action or engaged in any wrongdoing pertaining to her employment at Duke; and

F. mandate that Duke refrain from any further discrimination or retaliation against Dr. Farid.

2. That Dr. Farid receive judgment against Defendants jointly and severally in an amount to be determined at trial, but in excess of $25,000 for all applicable compensatory damages for pecuniary and non-pecuniary harms, losses, and damages, including without limitation that for emotional pain, suffering, inconvenience, mental anguish, loss

26

of enjoyment of life, damage to reputation, and any other applicable damages under 42 U.S.C. § 2000e-5(g) and (k), and common law;

3.     That Dr. Farid receive punitive damages against Dr. Vestal, pursuant to N.C. Gen. Stat. § 1D-1, *et seq*;

4.     That Dr. Farid recover from Defendants jointly and severally all pre-judgment and post-judgment interest and court costs, including without limitation expert witness fees, deposition costs, and attorneys' fees, pursuant to 42 U.S.C. §§ 12117(a), 12205, 2000e-5(k), and as permitted by law;

5.     That Dr. Farid receive a jury trial as to all matters so triable; and

6.     That the Court grant Dr. Farid such other and further relief as the Court deems just and proper.

This the 22nd day of August, 2024.

BAILEY & DIXON, LLP

By:    */s/ Philip A. Collins*
Philip A. Collins
434 Fayetteville Street, Suite 2500
Raleigh, North Carolina 27601
Telephone: (919) 828-0731
Email: pcollins@bdixon.com
NC State Bar No. 29153
Attorneys for Plaintiff

27